# EXHIBIT B

# GOZAL INCORPORATED DOT# 3141671
Status: Complete
View In CarrierWatch

**DAT** OnBoard

| | Company | Contacts | Fleet | Lanes | Tax | Documents | Insurance | Contracts |
|---|---|---|---|---|---|---|---|---|

## Contracts

| | | | | | |
|---|---|---|---|---|---|
| 3-DRAY Carriers | 4 | 12-15-2018 LSTR Brokerage Agr with Instruction Page | ---- | ---- | ---- |
| 3-DRAY Carriers | 3 | 6-15-2010 LSTR Brokerage Agr with Instruction Page | Nuriddin Abdullayev | Manager | Signed on: 09/01/18 |
| 2-CANADIAN Carriers | 4 | 12-15-2018 LSTR Brokerage Agr with Instruction Page | ---- | ---- | ---- |
| 2-CANADIAN Carriers | 3 | 6-15-2010 LSTR Brokerage Agr with Instruction Page | Abdullayev Nuriddin | Manager | Signed on: 09/01/18 |
| 1-UNITED STATES Carriers | 3 | 6-15-2010 LSTR Brokerage Agr with Instruction Page | Khusnitdin Abdullayev | President | Signed on: 09/17/18 |

THIS PAGE INSERTED FOR INSTRUCTION PURPOSES ONLY

PLEASE NOTE contract options:

1-UNITED STATES Carriers        (*sign if* main office is U.S. based)

2-CANADA Carriers               (*sign if* main office is Canada based)

3-DRAYAGE Carriers              (also sign if drayman)

4-QUICK PAY Program             (also sign if you desire 2DAY PAY and other Savings Plus** benefits like fuel discounts and tire savings)

Click the *Sign* link for the appropriate contract option(s) that pertain to your carrier operations; a box will pop up for you to TYPE first and last name, and TYPE title.



TYPE SIGNATURE – keying your full name [First and Last name] is accepted as signature.

TITLE –Landstar's contract to be signed by an Owner, Officer or member of management.

*Examples of invalid signatures:*

- No last name, only first name is typed as Signature
- No title is typed; title box is left blank
- Non-management title is given, example, DISPATCH, SALES, ACCOUNTING

**A Landstar Carrier Outreach Support representative will be contacting you for further accelerated settlement verifications; signing the Savings Plus (LSPP) program addendum is a necessary, first-step to you achieving a 2DAY PAY advantage and cardholder perks.

# TRANSPORTATION BROKERAGE AGREEMENT
## (Consolidated)

THIS TRANSPORTATION BROKERAGE AGREEMENT (Consolidated), including any subsequent appendices, addenda, exhibits or schedules (together, the "**Agreement**"), is made and entered on _____ ____ , 20___ by and among _____("CARRIER"), on the one hand, and on the other, one or more of the following distinct corporate entities that execute this Agreement as set forth on the execution page hereof:  Landstar Canada, Inc., Landstar Express America, Inc., Landstar Gemini, Inc., Landstar Global Logistics, Inc., Landstar Inway, Inc., Landstar Ligon, Inc., and Landstar Ranger, Inc., (said executing parties individually and collectively referred to as "BROKER").

**Whereas**, BROKER is licensed as a property broker by the Federal Motor Carrier Safety Administration ("FMCSA") [Landstar Canada, Inc. (USDOT No. 1717185), Landstar Express America, Inc., (USDOT No. 438639), Landstar Gemini, Inc. (USDOT No. 297386), Landstar Global Logistics, Inc. (USDOT No. 656499), Landstar Inway, Inc. (USDOT No. 2212563), Landstar Ligon, Inc. (USDOT No. 105213), and Landstar Ranger, Inc. (USDOT No. 2212928)]; and

**Whereas**, CARRIER is registered with the FMCSA as a motor carrier in interstate, intrastate, and/or foreign commerce and is in all respects qualified to transport freight as required by BROKER; and

**Whereas**, BROKER desires to engage CARRIER to perform transportation services for shipments within the limits of CARRIER's motor carrier operating authorities according to this Agreement's terms and conditions, and CARRIER desires to perform such transportation.

**Now, therefore**, intending to be legally bound, the parties agree as follows:

1. This Agreement's term shall be one year subject to earlier termination for any or no reason by either party giving at least thirty (30) day's written notice to the other party sent in accordance with the notice requirements set forth in this Agreement of intention to terminate.  Absent such notice, this Agreement shall automatically renew for successive one-year periods.

2. CARRIER represents and warrants that:  (a) it is duly and legally qualified and complies with all federal, state, provincial, territorial, and local laws, statutes, regulations, rules, and ordinances (collectively, "Applicable Law") to provide the transportation services contemplated herein; (b) all equipment and personnel used in providing the services contemplated herein shall meet all requirements of, and be in compliance with Applicable Law; (c) at no time will CARRIER provide services to BROKER while holding an "unsatisfactory" or analogous safety rating; and (d) it will immediately provide BROKER with notice, in writing, of any change in its safety rating and provide BROKER copies of any FMCSA Notice of Changes or Notice of Claim related to any change in safety rating.

3. There is no minimum volume of freight contemplated by this Agreement.  BROKER is not restricted from tendering freight to other carriers; CARRIER is not restricted from performing transportation for third parties.

4. CARRIER shall transport BROKER's shipments without delay and shall immediately notify BROKER of any likelihood of delay or of any incident or circumstance that will prevent or delay delivery to the consignee.

5. CARRIER shall obtain from the consignee a complete, signed delivery receipt for each shipment, and shall notify BROKER immediately of any exception on any document.  CARRIER shall send BROKER delivery receipts and bills of lading no later than fourteen (14) days from the date of delivery.  CARRIER may send delivery receipts, bills of lading and other shipment paperwork via a digital scanning service offered by BROKER.  Where CARRIER choses to submit the paperwork to BROKER using DirectScan, CARRIER agrees to pay a charge of $1.00 per freight bill.  Where CARRIER submits paperwork using Transflo® Mobile+ or another approved scanning service, CARRIER agrees to pay BROKER a fee of $2.00 per freight bill.

6. If BROKER requests CARRIER to transport any shipment required to be placarded under the DOT rules as a hazardous material and CARRIER accepts that shipment, CARRIER represents and warrants it holds all Federal and/or state permits and registrations necessary to transport the hazardous materials or waste.  CARRIER also represents and warrants all CARRIER's drivers transporting hazardous materials or waste (a) are properly trained and qualified under all Applicable Law, including, as example, 49 CFR §§ 172.700 and 177.800, and (b) have the proper endorsements on their Commercial Driver's License to transport such shipments.  CARRIER shall comply with all Federal, state, and local laws regarding the transportation of hazardous materials or waste, including, as example, 49 CFR Parts 172 and 397.  CARRIER shall provide BROKER with copies of all appropriate licenses, registrations and other documents upon BROKER's request.

7. Each shipment hereunder shall be evidenced by a Uniform (Straight) Bill of Lading containing terms and conditions no less favorable to the customer or beneficial owner of the cargo than those contained in the form of Uniform Straight Bill of Lading published as of July 1, 2016 in the National Motor Freight Classification ("N.M.F.C.") and naming CARRIER as the transporting carrier.  CARRIER's drivers shall be instructed to sign their company's name and record the seal number on every Bill of Lading evidencing a shipment under this Agreement.  Under no circumstances shall CARRIER prepare a freight document which lists BROKER as "Carrier" or "Shipper."  Documents for each of BROKER's shipments shall name BROKER as "broker" and CARRIER as "carrier."  If there is a wrongly worded document, the parties will treat it as if it showed BROKER as "broker" and CARRIER as "carrier."  If there is a conflict between this Agreement and any transportation document related to any shipment, including but not limited to Bills of Lading and Load or Rate Confirmation Sheets, this Agreement shall govern.  CARRIER agrees to indemnify and hold BROKER harmless from and against any direct, indirect and/or consequential loss, damage, fine, liability, judgment, cost and expense, including reasonable attorneys' fees, arising from any errors in the Bill of Lading, including by way of illustration without limitation, the showing of BROKER as "Carrier" or "Shipper".

8. CARRIER shall be wholly responsible for performing the contemplated transportation and for all costs and expenses of such transportation, including as examples, costs and expenses of all CARRIER's transportation equipment, its maintenance, and those persons who operate it.  As to BROKER, CARRIER is an independent contractor, and as such is wholly responsible in every way for

such persons as CARRIER hires, employs or otherwise utilizes, including all acts or omissions of such individuals as if they were employees of CARRIER. CARRIER shall, at its sole cost and expense, (a) furnish all equipment necessary or required for the performance of its obligations hereunder (the "Equipment"); (b) pay all expenses related, in any way, with the use and operation of the Equipment; (c) maintain the Equipment in good repair, mechanical condition and appearance; and (d) utilize only competent, able and legally licensed and qualified personnel.

9. CARRIER shall defend, indemnify, and hold BROKER and its customers harmless from and against all loss, liability, judgment, damage, claim, fine, cost or expense, including reasonable attorney's fees, arising out of or in any way related to: (a) CARRIER's performance hereunder, including but not limited to all claims that BROKER is liable for any act of or omission by CARRIER; (b) CARRIER's breach of any of the terms of this Agreement, including but not limited to Sections 11, 12, 17, 18 and/or 19; and/or (c) CARRIER's failure to comply with Applicable Law. The foregoing indemnity obligations of CARRIER shall not apply to the extent any loss, liability, judgment, damage, claim, fine, cost or expense is determined by a court of appropriate jurisdiction to result from the negligence of the party entitled to indemnity. CARRIER's obligations under this provision shall survive the termination of this Agreement.

10. During this Agreement's term, CARRIER shall procure and maintain, at its sole expense, the following insurance from Insurer(s) whose most recent and current rating by A.M. Best is at least a B+ or better or otherwise satisfies the minimum A.M. Best rating as published at **www.landstarcarriers.com** or another of BROKER's websites or related applications on the date of execution of this Agreement. If any of CARRIER's insurance policies expires during the term of this Agreement, each renewal or replacement policy must be provided by an insurance carrier whose A.M. Best rating satisfies the minimum required rating. Upon any renewal of this Agreement, CARRIER shall have forty-five (45) days from the renewal date to comply with BROKER's specified insurance requirements published on the website on the renewal date, including but not necessarily limited to the minimum A.M. Best rating then published on the Landstar website. Each insurance company providing any of the coverages required by this Agreement must be authorized to do business in all states in which the goods will move and have complied with all applicable regulations of the FMCSA and any other Applicable Law.

If CARRIER has in place FMCSA-approved self-insurance for all or any portion of the commercial automobile liability insurance required herein below, CARRIER, upon BROKER's request, must furnish BROKER with CARRIER's most recent annual and quarterly profit and loss statements and balance sheets prior to the effective date of this Agreement and submit such quarterly financial reports to BROKER during the term of this Agreement as might be requested by BROKER. BROKER shall receive and maintain such reports in confidence solely for purposes of this Agreement. In addition, if CARRIER is not self-insured for the entire amount of the minimum limits specified herein below for each required coverage, then and in such event each insurance carrier providing any portion of the required coverages and limits must comply with the above-specified A.M. Best requirements.

The required coverages and minimum limits are as follows:

(a) Commercial Automobile Liability Insurance with a combined single limit of the greater of $1 million ($US) or the minimum limit required by Applicable Law for each occurrence, covering all vehicles however owned, and/or used by CARRIER to transport BROKER's shipments, including coverage for all liabilities for personal injury (including death) and property damage arising out of CARRIER's transportation under this Agreement.

(b) Subject to Subsection 10(c) of this Agreement, All Risk Broad Form Motor Truck Cargo Legal Liability insurance in an amount not less than $1Million ($US) per occurrence. Without prejudice to the foregoing, CARRIER represents and warrants that its coverage includes, but is not limited to insurance against Acts of God, cargo contained in unattended vehicles, employee dishonest acts, mechanical breakdown, consequential loss, mischief or vandalism, water damage, fire, lightning, explosion, smoke, collision/overturn of vehicle, wind, theft, pilferage, hijacking, breakage, marring, scratching, collision of the load with another object (without collision of the vehicle) and leased and/or non-owned equipment and/or trailers used by CARRIER shall be covered under CARRIER's insurance policy with the same force and effect as if owned and scheduled on CARRIER's policy. Unless approved in advance by BROKER, the coverage provided under the cargo policy shall have no exclusions or restrictions of any type that would foreseeably preclude coverage, or reduce coverage amount, relating to any cargo loss, damage or delay claim for which CARRIER may be liable under this Agreement. CARRIER shall be responsible for any and all deductibles excluded by its insurer. Notwithstanding the foregoing, no deductible shall be in excess of $5,000.00.

(c) CARRIER shall provide directly a minimum of the first One Hundred Thousand Dollars ($100,000.00) ($US) of the All Risk Broad Form Motor Truck Cargo Legal Liability insurance referred to in Subsection 10(b) of this Agreement. In the event the CARRIER does not provide proof of the insurance coverage referred to in subparagraph (b) above in the amount of $1 million ($US), BROKER shall be entitled to obtain insured or self-insured coverage applicable solely for the protection of BROKER, which coverage: (i) shall be excess, non-contributory coverage; (ii) shall apply only after the cargo liability insurance coverage maintained directly by CARRIER has paid its full policy limits for any single occurrence; and (iii) shall apply only to claims made against BROKER. As applicable, CARRIER hereby authorizes BROKER to deduct from the freight charges to be paid CARRIER under this Agreement the amount set forth below for each shipment transported by CARRIER for BROKER's approximate expense in maintaining the excess, non-contributory cargo loss, damage or delay insurance coverage:

**A minimum of ONE DOLLAR AND SEVENTY-FIVE CENTS ($1.75) ($US) per truckload shipment or per drayage movement at point of origin or destination on intermodal shipments (the "Charge");**

The contingent cargo insurance is solely for the benefit of BROKER, its affiliates and subsidiaries and is subject to all of the terms, conditions and exclusions of the actual policy issued by the insurance underwriter to BROKER. In the event that a cargo loss, damage, or delay claim, or any portion thereof, is excluded from coverage under BROKER's contingent cargo program for any reason, CARRIER shall assume complete sole liability and responsibility for all such uninsured loss and shall indemnify, defend and hold BROKER harmless for any loss, damage or delay claim asserted against BROKER except to the extent a court of appropriate jurisdiction determines such loss to have been caused by the negligence or intentional misconduct of BROKER. CARRIER recognizes and agrees that CARRIER is not covered by the contingent cargo insurance referred to herein and that BROKER is not selling or soliciting insurance.

CARRIER acknowledges and agrees that BROKER may change the amount payable by CARRIER in connection with BROKER'S maintenance of its contingent cargo insurance coverage upon no less than thirty (30) days' notice. Any change to the Charge payable by CARRIER shall become effective no less than thirty (30) days following BROKER giving notice to CARRIER. CARRIER shall not be subject to any such change until thirty (30) days after such notice or such later time as is set forth in the notice, unless CARRIER signs an addendum consenting to the change, in which case the change described in the addendum will go into effect as set forth in the addendum. CARRIER hereby agrees and confirms that BROKER is not required to demonstrate or document any reason or basis for changes to the terms and conditions or the Charge for which notice is given. Acceptance of any shipment by CARRIER under this Agreement following the end of such thirty (30) day notice period shall constitute CARRIER's express consent, acknowledgement, authorization and acceptance of the new Charge amount and BROKER's implementation of the new Charge amount with respect to that shipment and each shipment thereafter.

(d) If CARRIER is requested by BROKER to transport hazardous materials, substances or waste, CARRIER will maintain public liability and property damage insurance, which include environmental damage due to release or discharge of a hazardous material, substance or waste, covering all operations of CARRIER with a combined single limit of the higher of $1 million ($US) or the minimum amount required by Applicable Law. Where Applicable Law requires a minimum coverage limit, including the $5 Million minimum under 49 C.F.R. 387.9, CARRIER will maintain and provide proof of such coverage.

(e) BROKER, its affiliates and subsidiaries shall be named as an additional insured or, in BROKER's sole discretion, a loss payee or a certificate holder, on CARRIER's Commercial Automobile Liability insurance and All Risk Broad Form Motor Truck Cargo Legal Liability insurance required under this Agreement. CARRIER shall furnish to BROKER, prior to accepting any shipment for transportation under this Agreement, a written certificate obtained from its insurance carrier(s) showing that such insurance has been procured, is being properly maintained and the expiration date. Written notice of cancellation, modification or reduction in coverage limits of the policy shall be given by CARRIER to BROKER at least thirty (30) days prior to such cancellation or modification. CARRIER will also provide to BROKER a complete copy of the applicable policies if so requested by BROKER, which obligation will survive cancellation or termination of this Agreement.

(f) CARRIER's maintenance of the insurance coverages and coverage limits as set forth in this Agreement shall not be construed or interpreted to be a restriction or limitation of any kind with respect to the CARRIER's liability arising under or relative to CARRIER's performance or nonperformance of any obligation under this Agreement.

11. In the event of loss, damage or delay in delivery, CARRIER shall be liable for damage arising therefrom in accordance with the provisions of this section. CARRIER assumes the liability of a motor carrier under the Carmack Amendment as currently codified at 49 U.S.C. § 14706 for loss, delay, damage to or destruction of any and all goods or property tendered to CARRIER pursuant to this Agreement from the time the shipment is tendered to CARRIER until delivery regardless of whether such standard would apply in the absence of this Agreement. The loss, damage or injury shall be measured as the lesser of the actual replacement cost or the cost of repair, subject to a maximum of $1 million ($US) per shipment. CARRIER waives any right to salvage damaged goods as well as the right to claim salvage credit with respect to damaged goods, but if salvage is granted, CARRIER will be entitled to a credit in the amount of salvage less costs related thereto. In addition, CARRIER shall indemnify BROKER for all indirect, special or consequential damages, or other special economic losses, including attorney fees that might be recovered against BROKER on any customer's claim. CARRIER shall promptly pay BROKER all claim amounts due hereunder and further authorizes BROKER to deduct all such amounts from any amounts owed to CARRIER by BROKER.

(a) In addition, CARRIER shall be solely liable and responsible for any reckless, dishonest or illegal acts of any personnel used to perform CARRIER's obligations hereunder and any claim arising from CARRIER furnishing contaminated Equipment, failing to meet U.S Food and Drug Administration and/or Canadian Safe and Sanitary Transport of Food regulations or to meeting any customer's previously communicated transport, temperature or other requirements.

(b) CARRIER shall not accept any shipment with a declared value or actual value of greater than $1 Million ($US) unless and until CARRIER has informed BROKER of the value of the shipment and has received authorization from BROKER to accept the shipment and complies with any instructions received from BROKER with respect to that shipment.

(c) For any freight claim, CARRIER shall pay BROKER or, at BROKER's request, BROKER's customer within thirty (30) days of CARRIER having been notified of the amount of the claim and furnished documentation substantiating the claim.

12. CARRIER shall not withhold delivery of any freight due to any dispute with BROKER regarding freight charges or otherwise. CARRIER waives and releases all liens which it might otherwise have to any freight in its possession. CARRIER agrees that BROKER has the exclusive right to handle all billing of freight charges to the customer for the transportation services provided herein, and, as such, CARRIER agrees to refrain and shall refrain from all collection efforts against the shipper, receiver, consignor, consignee, the freight or the customer.

13. CARRIER hereby waives its right to obtain copies of BROKER's records as provided for under 49 C.F.R. Part 371. Notwithstanding the foregoing, to the extent that CARRIER obtains records set forth in 49 C.F.R. § 371.3 by any means whatsoever, CARRIER agrees to refrain from utilizing such records in negotiating for the provision of services with any third party, including existing customers of BROKER. CARRIER further agrees and understands that all such records comprise BROKER's confidential information and trade-secrets. Nothing in this section is intended to relieve CARRIER of any other obligations imposed upon it by this Agreement, or to limit any rights of BROKER to enforce such obligations.

14. BROKER and CARRIER agree that the rates and charges for CARRIER's services hereunder shall be only those on the individual Load or Rate Confirmation Sheets, accepted, signed and submitted to BROKER by CARRIER prior to each shipment. Load or Rate Confirmation Sheets may also be submitted by BROKER to the CARRIER via electronic means and such shall constitute the CARRIER's binding acceptance of such Load or Rate Confirmation Sheet upon the earlier to occur of (a) the CARRIER's electronic acceptance of the Load or Rate Confirmation Sheet as verified by the BROKER's Information Services System, or (b) the CARRIER's

pick up of the shipment in question. Load or Rate Confirmation Sheets may include only rates and charges for transportation and related services, and specific pickup, delivery and handling instructions. The rates and charges in any Load or Rate Confirmation Sheet shall be all inclusive. In no event will any additional charges, including, but not limited to, detention, fuel surcharge, apply to any services performed pursuant to such Load or Rate Confirmation Sheet.

15. BROKER will pay CARRIER the agreed amount within thirty (30) days of BROKER's receipt of the documents specified on the Load or Rate Confirmation Sheets and any other documents necessary to enable BROKER to ascertain transportation has been properly provided. Payment shall be made by BROKER to CARRIER via direct settlement deposit using the Automated Clearing House (ACH) network to the account specified in writing by CARRIER. BROKER is hereby authorized to charge CARRIER an administrative fee of **$1.00 per settlement deposit.** All such administrative fees will be deducted from the freight charges payable to CARRIER by BROKER under this Agreement.

16. CARRIER agrees BROKER, at its option, may offset against any payments owed to CARRIER amounts CARRIER owes BROKER under this Agreement.

17. **CARRIER shall transport all freight tendered by BROKER only on Equipment operated under CARRIER's for-hire motor carrier authority. CARRIER shall not in any way sub-contract, broker, or arrange for the freight to be transported by a third party without BROKER's prior written consent.** In the event BROKER expressly consents to CARRIER brokering a shipment or where CARRIER breaches this provision, CARRIER shall remain directly liable to BROKER as if CARRIER transported such freight under its own authority in accordance with this provision, and shall further hold harmless and indemnify BROKER from any and all loss, liability, damage, claim, fine, cost or expense, including reasonable attorney's fees, arising out of or in any way related to the use of any subcontractor in violation of this provision regardless of whether arising from the conduct or omissions of CARRIER, the subcontractor, or any other third party. **If CARRIER in any manner sub-contracts, brokers, or otherwise arranges for freight to be transported by a third party, in addition to any other rights and remedies available to BROKER, BROKER may, in its sole discretion, pay the underlying carrier directly, which payment will relieve BROKER of any and all payment obligations to CARRIER with respect to such load.**

18. CARB COMPLIANCE: CARRIER hereby represents, warrants and otherwise certifies that (i) it is are aware of and, to the extent applicable to its operations, is in compliance with the California Air Resources Board Truck and Bus Regulation (Title 13, California Code of Regulations, Section 2025), Drayage Truck Regulation (Title 13, California Code of Regulations, Section 2027), , Greenhouse Gas Regulation (Title 17, Section 95300 et. seq.) and Transport Refrigeration Unit Regulations (Title 13, Section 2477), and (ii) any equipment that it uses or operates in California on any of BROKER's shipments shall be fully compliant with all applicable California Air Resource Board regulations, including but not limited to those listed herein. Upon request of BROKER, CARRIER shall provide proof of compliance in a form acceptable to BROKER.

19. SHIPMENTS FOR GOVERNMENTAL AGENCIES: The services and Equipment furnished by CARRIER on shipments for governmental agencies and their contractors will, at all times, be in full compliance with Applicable Law on government contracts and subcontracts. Such requirements include, without limitation, the obligation of CARRIER and all its subcontractors to comply with all applicable Federal Acquisition Regulations ("FAR"), 48 C.F.R. 52, et. Seq. and Department of Defense FAR Supplement ("DFARS"), Agency Acquisition regulations, 29 C.F.R. 471, Appendix A to Subpart A [implementing Executive Order 13496], definitions, clauses, provisions and requirements ("Subcontractor Requirements") that are binding upon all federal contractors and their subcontractors. Some of those requirements may include, but not be limited to:

    (a) The FAR mandatory Subcontractor Flow-Down Clauses and Requirements ("Subcontractor Requirements") for each governmental contract, as applicable, which are fully incorporated by reference, with the same force and effect as if they were included in this Agreement. Notice of the applicable mandatory Subcontractor Requirements will be provided to CARRIER by being posted on a website designated by BROKER and also made available to CARRIER upon written request.

    (b) CARRIER (i) requiring its subcontractors to comply with Applicable Law, including the FAR and DFARS; (ii) including all required and applicable Subcontractor Requirements in all of its agreements with its subcontractors; and (iii) requiring its subcontractors to include all required and applicable Subcontractor Requirements in all agreements they may have with their subcontractors.

    (c) Providing BROKER with all information and reports required by BROKER or at law to document and certify compliance with Applicable Law.

    (d) CARRIER's certification, by executing this Agreement, that neither CARRIER nor its principals, (i) are presently debarred, suspended or declared ineligible for award of contracts by Federal Agencies; or (ii) have been within the preceding three years convicted or had a civil judgment against it for fraud, violations of anti-trust laws, tax evasions or commission of other crimes in connection with performing a Federal or state contract. (Certification Regarding Executive Order 12689).

    Nothing in the provisions required by FAR, DFAR, Agency Acquisition regulations or other Applicable Law, if applicable, is intended as evidence that the CARRIER or any contractor or employee provided by CARRIER is an employee of BROKER.

20. It is expressly understood and agreed that CARRIER is an independent contractor for the services provided pursuant to this Agreement, and that CARRIER agrees to defend, indemnify and hold BROKER harmless from and against any claims, suits, costs or expenses, including reasonable attorney's fees, or actions in protecting BROKER's interests, brought by employees, subcontractors, any union, the public, or state, provincial or federal agencies alleging that the services arising out of the operations of CARRIER under this Agreement, including but not limited to claims that services under this Agreement were not provided as that of an independent contractor or that any employee or contractor of CARRIER is an employee of BROKER or that BROKER is liable for wages, compensation, expenses, benefits or other sums of any employee or contractor of CARRIER. CARRIER hereby assumes full control and responsibility for all hours scheduled and worked, wages, salaries, workers' compensation and unemployment insurance, state and federal taxes, fringe benefits, and all other costs relating to its operations pursuant to this Agreement.

21. BROKER may, from time to time, offer CARRIER the opportunity to purchase goods and services through programs facilitated by BROKER. CARRIER is not required to purchase any goods or services from such programs. A charge or an administrative fee, which may include profit to CARRIER, may be included in the amounts charged for goods and services through such a program.

22. This Agreement is the entire agreement between the parties with respect to its subject matter and supersedes all earlier agreements. In no event will any tariffs, service guides, terms and conditions, rates, classifications or schedules published, filed or otherwise maintained by CARRIER apply to any services performed pursuant to this Agreement. This Agreement cannot be altered or amended except in a writing signed by an authorized officer of each party and cannot be assigned or transferred in whole or in part. The benefits of this Agreement shall not inure to nor be available to any third party.

23. If the operation of any provision of this Agreement results in a violation of law or is deemed unenforceable by any court of competent jurisdiction, such provision shall be severed and the Agreement's remaining provisions shall continue in full force and effect.

24. CARRIER and BROKER expressly waive all rights and remedies allowed under 49 U.S.C. §14101 to the extent they conflict with this Agreement. BROKER's failure to insist upon CARRIER's performance under this Agreement or to exercise any right or privilege shall not be a waiver of any of BROKER's rights or privileges.

25. Except to the extent governed by federal transportation law, including Part B of Subtitle IV to Title 49 of the U.S. Codes, this Agreement in all respects shall be governed by, construed and enforced in accordance with the internal laws of the State of Florida, without regard to its conflict of law rules.

26. Each of the parties hereto irrevocably and unconditionally submits itself to the exclusive jurisdiction and venue of the state and federal courts serving Jacksonville, Florida, and any appellate court thereof, in any suit, action or proceeding arising out of or relating to this Agreement and further irrevocably and unconditionally waives any claim or defense that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Each party further agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions in any manner provided by law.

27. Notices shall be sent by certified mail, return receipt requested, or by nationally recognized overnight courier with receipt required, to each party executing this Agreement at the address shown below, or to such other addresses as shall have been designated in a written notice pursuant to this section.

28. CARRIER acknowledges and agrees that it will not drop a trailer other than at the designated business facilities of consignee or at a location designated by BROKER. CARRIER further agrees that, in the event any loss of or damage to the cargo or trailer occurs as a result of its breach of this provision, then the CARRIER will indemnify and hold BROKER and the customer harmless for any such loss or damage, including reasonable attorneys' fees.

29. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. In proving this Agreement in any judicial proceeding, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought. Any signature delivered by a party by facsimile, email or other electronic transmission shall be deemed to be an original signature hereto.

30. CARRIER acknowledges that each entity appearing on the consolidated signature page to this Agreement is a separate and distinct corporate entity and that Landstar Transportation Logistics, Inc. provides certain contract services and administration to each of those distinct entities. The use of this form of agreement for independent transactions by any of the entities named on the consolidated signature page is merely a convenience for the applicable BROKER party to this Agreement. This Agreement is only applicable to and enforceable by or against the CARRIER and the BROKER party (or parties) performing under this Agreement.

31. Electronic and Fax Communications; Computer Viruses. During the term of this Agreement, the parties anticipate that they will exchange materials and information in electronic form (collectively "Electronic Materials"), either through the other party's websites, e-mail or other electronic means (collectively "Electronic Connections") and via fax. By providing their fax numbers and signing this Agreement herein below, each party expressly consents to receiving communications via fax, text, email and all other electronic communication regarding all aspects of their relationship. BROKER and its affiliates take reasonable steps to protect Electronic Materials resident on its networks, stored in its electronic media, or available on its websites, and take reasonable steps to prevent harm arising from Electronic Connections. Due to the nature of Electronic Communications and the Internet, BROKER and its affiliates do not provide, and expressly disclaim, any warranty (i) that Electronic Materials received by the CARRIER will be free from computer viruses or (ii) that Electronic Connections with the CARRIER will be free from harmful effects. It is the CARRIER's responsibility (i) to take reasonable steps to protect Electronic Materials resident on its networks, stored in its electronic media, or available on its websites, (ii) to take reasonable steps to prevent harm arising from Electronic Connections, and (iii) to perform any anti-virus, scanning, data backup, security, and other precautions reasonably necessary to safeguard against computer viruses, worms, and other intrusive or damaging code (collectively "Computer Viruses") and other threats posed by Electronic Materials and Electronic Connections. Under no circumstances will BROKER or its affiliates be responsible for, and CARRIER hereby expressly waives and releases BROKER and its affiliates from, any liability for any loss or damage caused by Computer Viruses, the CARRIER's receipt of Electronic Materials from BROKER or its affiliates or Electronic Connections between BROKER and its affiliates and the CARRIER.

**THE FOLLOWING CONSOLIDATED SIGNATURE PAGE IS A CONVENIENCE ONLY FOR THE BROKER PARTY OR PARTIES PERFORMING UNDER THIS AGREEMENT. THE BROKER PARTIES MAY SIGNIFY THEIR RESPECTIVE SIGNATURES BY THE SINGLE EXECUTION OF THE SIGNATURE BLOCK LABELED "ON BEHALF OF THE ENTITIES NAMED BELOW" IN WHICH CASE THE BROKER PERFORMING UNDER THIS AGREEMENT SHALL BE DEEMED TO HAVE EXECUTED INDIVIDUAL AND INDEPENDENT AGREEMENTS WITH THE CARRIER. NOTWITHSTANDING THE EXECUTION OF THE SIGNATURE BLOCK LABELED "ON BEHALF OF THE ENTITIES NAMED BELOW," NO JOINT OR CROSS LIABILITY SHALL ARISE AGAINST, BETWEEN OR AMONG THE BROKER PARTIES. THE AGREEMENT SHALL ONLY BE APPLICABLE TO AND ENFORCEABLE BY OR AGAINST THE BROKER PARTY ACTUALLY PERFORMING UNDER THE AGREEMENT.**

**In Witness Whereof**, the parties hereto have caused this Agreement to be executed in their respective names by their duly authorized representatives effective as of the date first above written.

| "BROKER" | "CARRIER" |
|---|---|
| **LANDSTAR TRANSPORTATION LOGISTICS, INC**., on behalf of the entities named below | **List individual's name as company when applicable.** |
| By: _____ <br> Authorized Agent or Attorney-in-Fact | CARRIER COMPANY: _____ |
| Printed Name: _____ <br> Address: 13410 Sutton Park Dr., South <br> Jacksonville, FL 32224 | **AUTHORIZED SIGNATURE**: **X**_____ |
| **LANDSTAR CANADA, INC.** | Print Name: _____ |
| **LANDSTAR EXPRESS AMERICA, INC.** | Print Title: _____ |
| **LANDSTAR GEMINI, INC.** | Address: _____ |
| **LANDSTAR GLOBAL LOGISTICS, INC.** | City/State/Zip: _____ |
| **LANDSTAR INWAY, INC.** | Phone: _____ |
| **LANDSTAR LIGON, INC.** | Fax/Email: _____ |
| **LANDSTAR RANGER, INC**. | FID#: _____ |
| | USDOT#:_____ |